# In the United States Court of Federal Claims

No. 10-249 C
Filed: January 21, 2011;
Released for publication: February 7, 2011[1]

************************************
*
**COMMISSIONING SOLUTIONS GLOBAL, LLC** *
*
Plaintiff, *
*
v. *
*
**THE UNITED STATES,** *
*
Defendant. *
*
************************************

*Robert S. Reich*, Reich, Album & Plunkett, LLC, Metairie, LA, for Plaintiff

*William P. Rayel*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk Manhardt*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice

**ORDER AND OPINION**

DAMICH, Judge:

In this post-award bid protest, Plaintiff (or "CommSol") moves for judgment on the administrative record (AR), complaining that it should have been awarded contracts for the repair of certain vessels of the United States Coast Guard (variously, "USCG," "Coast Guard," or "Defendant"). The essence of Plaintiff's complaint is that it was unfairly assigned a past performance rating of "neutral," which worked to its detriment in the Coast Guard's best value determinations underlying the contract awards. Defendant has moved to dismiss the complaint

[1] The court issued this opinion under seal on January 21, 2011, and gave the parties to February 4, 2011, to propose the redaction of competition-sensitive, proprietary, confidential, or otherwise protected information. The court has accepted the parties' proposed redactions, which are indicated herein in the format of three consecutive asterisks within brackets ("[***]").

on the ground that Plaintiff lacks standing to challenge the awards at issue and, in the alternative, has cross-moved for judgment on the AR.

For the reasons stated below, the court GRANTS-IN-PART and DENIES-IN-PART Defendant's motion to dismiss and DENIES Plaintiff's motion for judgment on the record. Defendant's motion for judgment on the record is GRANTED as to the remainder of Plaintiff's complaint.

I. Background

Plaintiff's business is incorporated under the laws of the state of Louisiana and its principal place is in Mandeville, Louisiana.

In response to separate solicitations to contractors for repair work on four different Coast Guard vessels, Plaintiff submitted what it avers were the lowest-priced bids and "supplied references within the Coast Guard concerning its past performance." The solicitations were for work on USCG vessels the "Staten Island" (Solicitation No. HSCG80-09-Q-313J68), "the Sapelo" (Solicitation No. HSCG80-09-Q-3FAJ23), the "Knight Island (Solicitation No. HSCG80-10-Q-3FA015)," and the "Patoka" (Solicitation No. HSCG80-10-Q-3FA020).[2] In each of these solicitations, there were two factors for the evaluation of competing bids: "past performance and price – with past performance significantly more important than price." Pl.'s Mot. 2; AR 31, 607-08, 1686, 1948.

A. The Staten Island

On March 30, 2009, the Coast Guard issued the solicitation for "drydock repairs" to the Staten Island, a 110-foot "C" class patrol boat, "at the contractor's facility." AR 3, 6. The solicitation indicated that the work would take up to 70 days. AR 8. The Presolicitation Notice advised that "[t]he Coast Guard intends to conduct this procurement in accordance with Federal Acquisition Regulation (FAR) Part 12, Acquisition of Commercial Items and FAR Subpart 13.5, Test Program for Certain Commercial Items." AR 3. With regard to the evaluation of bids, the solicitation advised, "******Past Performance is significantly more important than Price. As the past performance of the offerors is determined to be more equal, the price evaluation becomes more of a determinant in the Best Value decision******". AR 31.

The solicitation stated that the factors for evaluating past performance would include: 1) quality of product or service, 2) timeliness of performance, 3) business relations, and 4)

[2] In its complaint, Plaintiff similarly challenged the award of contracts to other bidders for work on USCG vessels the "Willow" (Solicitation No. HSCG80-08-Q-3FAF01) and the "Hatchet" (Solicitation No. HSCG80-10-Q-3FA021), as well as the cancellation of the solicitation for work on the "Pamlico" (Solicitation No. HSCG80-10-Q-P45700). Compl. 1-6. Because Plaintiff has not raised these contracts in its motion for judgment on the AR, the court concludes that they are no longer at issue. *See Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 358 (2007); *Novosteel SA v. United States*, 284 F.3d 12611273-74 (Fed. Cir. 2002).

Subcontracts. As the basis for this evaluation, offerors were requested to provide "at least two (2) relevant (construction, overhaul, repair and alteration of ships) federal, state or local Government or private contracts performed during the last three (3) years," including, inter alia, the dollar value of the past contracts and the type of service performed. AR 30. "In evaluating Contractors[‘] past performance, the government intends to also review U.S. Coast Guard Contractor Performance Reports and other existing past performance ratings on relevant contracts." *Id*.

In response, Plaintiff submitted information on three past contracts with the Coast Guard. The first was for 380 hours of "dry dock work" on an unnamed vessel in July 2009 with a final contract value of $35,546. The second was for "hot flush of the main engine & coolers" of the USCG "Midgett" from January 30 to February 9, 2006, with a final contract value of $94,543.50. The third reference provided for assessing past performance was for "oil flush of the main reduction gear & lines" of the USCG "Boutwell" from December 11 to December 24, 2006, with a final contract value of $115,612.31. AR 305.

The Coast Guard received four quotes in response to the Staten Island solicitation. AR 428. CommSol's price was $623,585.61. The eventual awardee (and second lowest offeror), Centrifugal Rebabbiting, Inc. ("CRI"), bid $732,480. The "Government Estimate" price for the work was $532,905. *Id*. In a June 8, 2009, "Acquisition Trade Off Analysis" Memorandum, CommSol was "ranked first in price and was rated 'Neutral' on past performance," whereas CRI was rated "Excellent" on past performance. *Id*. Another offeror also was rated "Excellent" on past performance, but ranked fourth in price; the remaining offeror was rated "Good" on past performance and ranked third in price. *Id*. Furthermore, the Coast Guard observed that CRI had recently completed drydocking and repair work on the USCG vessel the "Drummond" which "contained many of the same work items that are included in the instant procurement." *Id*. The analysis added,

> It is apparent when comparing the actual level of work performed on similar drydock and repair contracts with the work to be performed on the instant procurement that Centrifugal Rebabbiting, Inc clearly has performed on more complex contracts that are consistent with the scope and value of the work to be performed on the USCG STATEN ISLAND. The references provided by Commissioning Solutions Global, LLC consisted of work that was not nearly as complex or similar to both the scope and value of the work on the instant procurement.

*Id*.

The memorandum concluded that the "higher past performance rating and experience" of CRI was "worth the additional monetary expenditure" over CommSol's bid. AR 429.

CommSol's "Neutral" rating for past performance was based on the references that it had provided for its work on the Midgett and the Boutwell vessels. AR 425. The contracting officer (aka "Source Selection Authority") for the Staten Island solicitation, Louis Romano, sent a "past performance questionnaire" to the USCG points of contact for Plaintiff's 2006 work on the Midgett and on the Boutwell. The point of contact on the Midgett, Roy Gilbert, wrote back by email on April 28, 2009, that the "file is not located in this area any longer and I do not recall the performance by this contractor." AR 402. The point of contact on the Boutwell, Valerie Rivera-Chase, failed to respond. "Numerous attempts to contact Ms. Rivera-Chase in order to obtain the past performance responses for the work performed on the USCGC Boutwell project resulted in no response from Ms. Rivera-Chase." AR 425. The Gilbert response and the Rivera-Chase non-response were the reasons for the assignment of CommSol's "Neutral" rating for past performance with respect to the Staten Island solicitation. *Id*.

CRI received its "Excellent" past performance rating based on three contracts it had performed for the Coast Guard for drydock and dockside repair on USCG vessels the Knight Island, the Nantucket, and the Hudson. AR 425. Both the Knight Island and the Nantucket are 110-foot patrol vessels like the Staten Island; the Hudson is a 160-foot "Inland Construction Tender." All three of these contracts exceeded $500,000 in value.[3] AR 410-425.

B. The Sapelo

On April 3, 2009, the Coast Guard issued the solicitation for "Dry Dock and repairs" to the USCG vessel the Sapelo, a 110-foot "A" Class patrol boat. AR 534, 627. The procurement was conducted in accordance with Parts 12 and 13.5 of the FAR. AR 534. The work was anticipated to take up to 60 days. AR 583. The total "Government Estimate" cost was $534,700. AR 1062. The solicitation, like the solicitation for the Staten Island, listed two evaluation criteria: past performance and price, noting that "******Past Performance is significantly more important than Price******". AR 607-08. Also, like the Staten Island solicitation, the factors for evaluating past performance would include: 1) quality of product or service, 2) timeliness of performance, 3) business relations, and 4) subcontracts. As the basis for evaluation, offerors were requested to provide "at least two (2) relevant (construction, overhaul, repair and alteration of ships) and current federal, state or local Government or private contracts performed during the last three (3) years," including, inter alia, the dollar value of the past contracts and the type of service performed. AR 607. The government intended to review U.S. Coast Guard Contractor Performance Reports and other relevant past performance ratings. *Id*.

There were twelve quotes submitted for the work on the Sapelo, including bids from CommSol and from the eventual awardee, Riverhawk Marine, LLC. AR 1059. CommSol's price was $442,143; Riverhawk's was $603,793. AR 1062. Even with "foreseeable costs"

[3] The court notes, however, that the contract expiration date for CRI's work on the Nantucket was "8/31/05," AR 420, beyond the three-year period specified in the Staten Island solicitation, AR 22.

factored in, CommSol was the low bidder. Riverhawk had the second-lowest bid based on its bid price plus foreseeable costs.

CommSol provided as references on past performance the same three contracts that it had referenced in response to the Staten Island solicitation. AR 858-59. The USCG contract specialist on the Sapelo solicitation again sought past performance information from Mr. Gilbert regarding CommSol's work on the Midgett and from Ms. Rivera-Chase regarding the Boutwell work. AR 1022, 1023. Mr. Gilbert responded that "I don't recall the performance by this vendor and this PO file is no longer located in this area." AR 1021. Despite both an initial email and a follow-up phone call to Ms. Rivera-Chase, the latter never did complete or return the proposed Past Performance Questionnaire nor provide any further information. AR 1020. The contracting officer on the Sapelo solicitation concluded that CommSol's past performance references "were not considered relevant because they were not of the same complexity, scope, and dollar value of this acquisition. Based on these findings, Commissioning Solutions Global past performance rating is 'neutral.'" AR 1060. Of the 12 offerors, CommSol was the only one whose experience was not considered relevant on the basis of complexity, scope, and dollar value. AR 1059-61.

Riverhawk was found to have had relevant ship repair experience and [***] to [***] past performance history from drydock repairs in 2008, with a contract value of $338,515, to the Coast Guard vessel the Key Biscayne.[4] AR 1015-19.[5] Accordingly, it received an "excellent" rating for past performance with respect to the Sapelo solicitation and was determined to offer the "best value" to the government. AR 1063.

CommSol subsequently protested the award of the Sapelo contract to Riverhawk before the Government Accountability Office (GAO). The protest was denied. GAO found "reasonable the agency's assessment of CommSol's past performance – both the agency's determination that CommSol's contracts were not relevant and the agency's assessment of a 'neutral' rating to CommSol's quotation." AR 1082. With regard to the relevance of CommSol's referenced past contracts, the GAO decision noted the significant difference in the type or scope of work performed:

> For example, CommSol's two largest contracts were for flushing engines, which the agency explains are only a small part of the 67 dry dock requirements that would be performed here. CommSol's third contract was for dry dock work, but the contract was only for

[4] The Coast Guard also considered Riverhawk's ongoing, although not yet completed, work performing dry dock repairs on the USCG vessel the Pea Island, a 110-foot cutter. The contract value for the Pea Island repairs was $1,260,541.56. Although a contractor performance report on Riverhawk's Pea Island work was not yet available because the job was still underway, it was relevant to an assessment of Riverhawk's experience in complex repairs. *See* AR 1080-82.

[5] Of the remaining offerors, one was rated "Outstanding," six were rated "Excellent," three were rated "Good," and one was rate "Poor" for past performance. AR 1061.

> $35,546.00, which was only a small fraction of the government estimate of $534,700.00.

*Id*.

C. The Knight Island

On October 1, 2009, the Coast Guard issued the solicitation for dry dock repairs for the USCG cutter the Knight Island, a 110-foot patrol boat. AR 1907, 1920. The period of performance was assessed at 60 days and the contract value estimated at between $600,000 and $750,000. *Id*. The procurement was conducted in accordance with FAR parts 12 and 13.5. *Id*. Proposal requirements and evaluation criteria were the same as for the Staten Island solicitation: submission of two relevant past performances references, consideration of USCG Contractor Performance Reports, etc. AR 1947. The solicitation stated, just as with the Staten Island solicitation, "******Past Performance is significantly more important than Price. As the past performance of the offerors is determined to be more equal, the price evaluation becomes more of a determinant in the Best Value decision******". AR 1948. CommSol identified the same three past contracts as references that it provided for its bids for the Staten Island and Sapelo contracts. AR 2267-68.

CommSol's revised bid, after adjustment for a solicitation amendment requiring greater welding services, was $717,412. AR 2474. There were seven quotations received in response to the solicitation; CommSol was, as with the Staten Island and the Sapelo solicitations, the lowest bidder. The next lowest bidder, and eventual awardee, was Master Marine, Inc., which quoted $939,208. *Id*.

The Coast Guard apparently relied on the unsuccessful efforts to obtain past performance questionnaire results of the contract specialist in the Sapelo procurement in assigning CommSol a past performance rating of "neutral" for purposes of the Knight Island solicitation. AR 2413-16, 2475; Def.'s cross-mot. at 10, n.6. In addition, the contracting officer for this solicitation concluded that CommSol's "two past performances in reference were not considered relevant because they were not of the same complexity, scope and dollar value of this acquisition." AR 2475. Of the 7 offerors, CommSol was the only one whose experience was not considered relevant on the basis of complexity, scope, and dollar value. AR 2475-76.

By contrast, Master Marine was given an excellent past performance rating for its work performing dry dock repairs on the Coast Guard vessel the Kodiak Island in 2008, on a contract valued at $526,832.91, and for similar work on the Coast Guard vessel the Axe in 2008, on a contract valued at $315,111.15. AR 2401-12.[6] The contracting officer on the Knight Island solicitation determined therefore that Master Marine's bid offered the best value for the government. AR 2476.

[6] Of the remaining offerors, four were rated "Excellent" and one was rated "Good." AR 2474.

D. The Patoka

On September 30, 2009, the Coast Guard issued the solicitation for dry dock and repairs to the USCG cutter the Patoka, a 75-foot river buoy tender. AR 1656, 1661. The period of performance was estimated to be up to 110 days and the Government Estimate of total price was $1,086,630.00 (between $1,000,000 and $5,000,000 in the presolicitation notice). AR 1656, 1663, 1856. Proposal requirements and evaluation criteria were the same as for the Staten Island solicitation: submission of two past performances references, consideration of USCG Contractor Performance Reports, etc. AR 1685-86. As with the Sapelo solicitation, the Patoka solicitation noted that "******Past Performance is significantly more important than Price******". AR 1686. CommSol identified the same three past contracts as references that it provided for its bids for the Staten Island, Sapelo, and Knight Island contracts. AR 1715-16.

There were five bids submitted in response to the Patoka solicitation. CommSol's bid was $1,006,669; it was the second-lowest bid. The third-lowest bid, and the eventual awardee, was Wepfer Marine, Inc., at $1,099,990. AR 1854. Pursuant to the solicitation, "foreseeable costs of transporting the USCGC Patoka to each of the offerors' commercial shipyard were calculated for the purpose of price evaluation." AR 1856. Based on the adjusted price analysis, Wepfer Marine had the lowest total evaluated cost, at $1,165,373.52; CommSol had the third lowest total evaluated cost, at $1,224,154.72. *Id.*

CommSol was assigned a "neutral" rating for past performance, based on the "lack of recognizance or documentation of the contractor's performance" in the Midgett and Boutwell contracts. AR 1855. In addition, the contract specialist on the Patoka solicitation noted in a post-award communication to CommSol that its past work "was for jobs performed on the west coast of a much smaller scale than the solicitation in question." AR 1901.

Wepfer Marine was given a "Excellent+" past performance rating for purposes of the Patoka solicitation in light of its work on a $1,008,354 contract for ship repairs to the USCGC Muskingum, for which it had been rated [***], and for a $354,370 contract for ship repairs to the USCGC Osage, for which it had been rated [***]. AR 1855.

II. Jurisdiction, Standing, and Standard of Review

A. Defendant's Motion to Dismiss for Lack of Standing

The Court of Federal Claims has jurisdiction under the Tucker Act to render judgment in actions by an interested party challenging the award of a contract in connection with a procurement. 28 U.S.C. § 1491(b)(1); *EREH Phase I LLC v. United States*, 95 Fed. Cl. 108, 112 (2010). In its motion to dismiss, however, the Government argues that the court lacks

jurisdiction to entertain Plaintiff's complaint because Plaintiff lacks standing to bring its protest. Standing is clearly a "threshold" jurisdictional requirement. *Myers Investigative and Security Services, Inc., v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002). Furthermore, "[t]he party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing.]" *Id*. (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute . . ." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The reason for this threshold inquiry is to respect "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Id*. There are three elements of standing: 1) a plaintiff must show that it has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; 2) injury must be "fairly traceable" to the action of the defendant; and 3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Magnum Opus Techs., Inc. v. United States*, 94 Fed. Cl. 512, 528 (2010) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc*., 528 U.S. 167, 180-81 (2000). The requirement of standing on a bid protest in the Court of Federal Claims, however, is even more particular. "In this court, plaintiffs face the further hurdle of statutory standing." *Magnum Opus*, 94 Fed. Cl. at 529.

Under the Administrative Dispute Resolution Act, plaintiffs in bid protest actions are limited to those who are actual or prospective bidders and who can demonstrate that they possess "a direct economic interest." *Id*. (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). The showing of "direct economic interest" amounts to a showing of prejudice. "[T]he Federal Circuit has construed the second element, the 'direct economic interest' prong, to mean that a successful protestor must also establish that the errors complained of caused prejudice." *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 283 (2006). The hurdle is not trivial. "[A] bid protester must have a substantial chance of receiving an award in order to have an economic interest in it and therefore standing to file a bid protest." *Labatt Food Service, Inc. v. United States*, 577 F.3d 1375, 1379 (Fed. Cir. 2009).[7]

The court in *Textron* noted that the prejudice standard is not only an element of standing (which is a non-merits-based inquiry, *see Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003)), but also a required showing in a later stage, merits-based determination warranting injunctive relief. *Textron*, 74 Fed. Cl. at 284.[8] It cautioned accordingly against "a round-robin through the arguments on the merits in order to resolve a jurisdictional

[7] The court notes that decisions in this court and in the Federal Circuit have variously referred to plaintiffs in bid protests as "protesters" or "protestors." This court will employ the latter spelling, except where citing the former in a quotation.

[8] "This court thus looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether a plaintiff shall be afforded relief." *L-3 Global Comunications Solutions, Inc. v. United States*, 82 Fed. Cl. 604, 608 n.4 (2008).

issue. Such is not a desirable or appropriate procedure." *Id*. at 284-85.[9] To thread its way carefully through this dual-stage inquiry, it adopted an approach to standing focusing on the status of the protestor and avoiding the parties' arguments on the merits: a protestor would have standing only if it was

> (1) either a bidder or proposer that has been prevented from bidding or proposing due to some infraction other than the terms of the solicitation itself; or (2) either a bidder or proposer who would be *in contention* absent an unreasonable procurement decision or violation of applicable procurement regulations.

*Id*. at 285 (emphasis added). *Accord Bilfinger Berger AG Sede Secondaria Italiana v. United States*, – Fed. Cl. –, 2010 WL 4721297, Nov. 17, 2010 (No. 10-480 C), at *36.

In a similar vein, the court in *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 391, 392 & n. 23 (2005), characterized the prejudice inquiry for purposes of assessing standing as a "limited review" in search of the "minimum requisite evidence" of injury to a protestor's "substantial chance of obtaining the contract, assuming that the protestor's substantive allegations bear out." Nevertheless, if, despite the alleged procurement error, the protestor would still not have been "in contention" or still had a "substantial chance" of obtaining the contract, then the protestor has not been prejudiced and lacks standing. "Without a showing of harm specific to the asserted error, there is no injury to redress, and no standing to sue." *Labatt*, 577 F.3d at 1381.

In Plaintiff's motion for judgment on the administrative record, it assigned essentially two errors in the procurement process on the four contracts in question. First, it complains of the Coast Guard's "failure to properly maintain its records regarding plaintiff's past performance" on the Boutwell and Midgett projects and its failure to make reasonable efforts to obtain that information, leading to its "neutral" past performance rating and thus tainting the awards made on the Sapelo, the Staten Island, the Patoka, and the Knight solicitations. Pl.'s Mot. 7, 9, 10. Second, the Coast Guard failed "to document the procedures used in its determinations of the 'best value' tradeoff analysis" and "of the specific technical merits of awarded Offerors' proposals that warranted higher prices." *Id*. at 7. Specifically, it argues that "absent any documentation regarding the specific procedures used, it is impossible to gauge whether there was any rationality or consistency to" the Coast Guard evaluations," *id*. at 9, and that "where a price/technical tradeoff is made, the source selection decision must be documented, and the documentation must include the rationale for any tradeoffs made, including the benefits associated with additional costs." *Id*.

---

[9] The court in *Magnum Opus* similarly observed that, because a plaintiff's failure to establish standing precludes a ruling on the merits, the corollary is that a plaintiff cannot be required "to prove the merits of its case in order to demonstrate standing." *Magnum Opus*, 94 Fed. Cl. at 530 n.12.

The court finds, however, that with regard to the Sapelo and Knight Island contracts, Plaintiff was not "in contention" despite the errors it alleges in the process. In both of these solicitations, it was manifestly not CommSol's "neutral" rating that precluded its award but the specific findings that its prior experience on the Boutwell and Midgett Coast Guard contracts was not "relevant" in complexity, scope, and dollar value. AR 1060; AR 2475.[10] Thus, even had the performance reports on those jobs been obtained and found to have been "excellent" or even "outstanding" and even had the best value analyses been as thoroughly documented as Plaintiff alleges was required, it would not have remained in the running for the award of either contract. The language in those solicitations that past performance was a factor more critical than price did not limit that consideration to past performance reports, but to past performance in all its aspects. Furthermore, the solicitations specifically required that offerors submit references of two "relevant" contracts performed during the previous three years, including information on the type of service performed.

The errors that Plaintiff assigns to the evaluation process, thus, did not prejudice its chance to receive the award of either of these contracts. "Here, however, there is no showing of how the government's error caused [Plaintiff] to suffer disparate treatment or particularized harm." *Labatt*, 577 F.3d at 1380. Plaintiff's "proposal would not have been improved and its chances of securing the contract would not have been increased" had it not been for the alleged errors. *Id*. at 1380-81. Accordingly, as to the Sapelo and Knight Island contracts, CommSol has not established prejudice and therefore lacks standing. Defendant's motion to dismiss with respect to these contracts is granted. Because the Coast Guard made no such explicit finding of lack of relevance with respect to the Staten Island and Patoka solicitations, the court denies the government's motion to dismiss those parts of Plaintiff's complaint.

B. Bid Protest Standard of Review

Under the Tucker Act, the Court of Federal Claims reviews the agency's decision in a bid protest "pursuant to the standards set forth in section 706 of title 5" of the Administrative Procedure Act (APA) (5 U.S.C. §§ 551-559, 701-706). 28 U.S.C. § 1491(b)(4). Under the APA, the inquiry is whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law" or "without observance of procedure required by law." 5 U.S.C. § 706(2). The Federal Circuit has described the standard of review as whether the procurement decision "lacked a rational basis" or "involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *see also Med. Devel. Int'l, Inc. v United States*, 89 Fed. Cl. 691, 700 (2009). For a determination whether the decision had a rational basis, the scope of review is narrow: "The Court will look to see if an agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Gulf Group Inc. v. United States*, 61 Fed. Cl. 338, 351 (2004) (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 20, 43 (1983).

[10] As Defendant points out, Plaintiff "does not challenge these findings" of lack of relevance. Def.'s Mot. to Dismiss and Cross-mot. for J. on AR 14.

When the protest alleges a violation of regulation or procedure, the disappointed bidder must show that the violation was "clear and prejudicial." *Impresa*, 238 F.3d at 1333.

The protestor bears a heavy burden of showing that the award decision lacked a rational basis. *Id*. The burden is even higher in a "best value" procurement. "Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *E. W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Galen Med. Asso., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("the contracting officer ha[s] even greater discretion than if the contract were to have been awarded on the basis of cost alone"). "And in cases such as this, when a negotiated procurement is involved and at issue is a performance evaluation, the greatest deference possible is given to the agency – what our Court has called a 'triple whammy of deference." *Gulf Group*, 61 Fed. Cl. at 351 (citing *Overstreet Electric Co. v. United States*, 59 Fed. Cl. 99, 117 (2003)).

Procedurally, the court proceeds in "two steps." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). "First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review . . . then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct."[11] *Id*. In a post-award bid protest, such as here, the plaintiff must demonstrate that the errors in the procurement process "significantly prejudiced" it. *Id*. at 1353. "To establish 'significant prejudice' [the plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for the errors . . ." *Id*. (citations omitted).

Pursuant to Rule 52.1(b) of the Rules of the Court of Federal Claims (RCFC), the court considers the parties' cross-motions for judgment on the administrative record as "akin to an expedited trial on the paper record." *L-3 Global Communications*, 82 Fed. Cl. at 608. The court inquires whether a party has met its burden of proof, and makes fact determinations as necessary, based on the existing administrative record. *Id*. at 607-608; *Bannum*, 404 F.3d at 1356.

## III. Discussion

### A. The Staten Island

Plaintiff complains that it was the lowest-bidder in response to the solicitation for repair work on the Staten Island, yet the contract award was made to another offeror. In awarding the contract to the second-lowest offeror, CRI, the Coast Guard explained the basis for the award as follows:

> It is apparent when comparing the actual level of work performed on similar drydock and repair contracts with the work to be performed

[11] This is the second, merits-based prejudice inquiry to which the court referred in *Textron*, supra.

> on the instant procurement that Centrifugal Rebabbiting, Inc clearly has performed on more complex contracts that are consistent with the scope and value of the work to be performed on the USCG STATEN ISLAND. The references provided by Commissioning Solutions Global, LLC consisted of work that was not nearly as complex or similar to both the scope and value of the work on the instant procurement.

AR 428.

In addition, the Coast Guard ranked CRI as "excellent" on past performance, whereas it assigned a rank of "neutral" to CommSol due to the Coast Guard's inability to obtain past performance reports from the Coast Guard points of contact for CommSol's prior work on the Boutwell and the Midgett.

In choosing CRI over CommSol, the Coast Guard clearly made a "best value" decision. Plaintiff argues that the agency's "'best value' tradeoff analysis was both irrational and in contravention of both law and regulation." Pl.'s Mot. 7. In particular, it avers that the Coast Guard failed to review its own documents, i.e., the performance reports of its past work on the Boutwell and the Midgett, failed "to exert a minimum of effort to locate the USCG's own file" (including failure to give any reasonable explanation for not adhering to unspecified procedures regarding document retention or to explain Ms. Rivera-Chase's complete lack of response to requests for the Boutwell performance report), and failed to document the "specific technical merits" of the CRI proposal to justify its higher price. *Id*. at 7-8. CommSol further asserts that Federal Acquisition Regulation (FAR) 15.406-3 requires documentation of "the extent to which the contracting officer relied on the cost or pricing data submitted and used." *Id*. at 7. It also argues that the tradeoff analysis mandated by FAR 15.101-1 requires that "[t]he perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406." *Id*. at 8.

Defendant notes, however, that the solicitation for the Staten Island was "conducted pursuant to FAR Parts 12 and 13.5, not FAR Part 15." Def.'s Mot. 21; AR 3, 29. Accordingly, the documentation standards of 48 C.F.R. § 15.406-3 to which Plaintiff alludes were not applicable to this procurement. Pursuant to 48 C.F.R. § 12.602(c), the Coast Guard was obligated to "[f]ully document the rationale for selection of the successful offeror, including discussion of any tradeoffs considered." Pursuant to 48 C.F.R. § 13.501(b)(3), the Coast Guard was required to provide an "explanation, tailored to the size and complexity of the acquisition, of the basis for the contract award decision." By contrast, the portion of 48 C.F.R. § 15.604-3 which Plaintiff cites directs that the contracting officer must document the extent to which he "[r]elied on the certified cost or pricing data submitted and used . . ." Not only, however, did Plaintiff opt not even to rebut the Government's argument that § 15.406-3 was not required under

this solicitation,[12] the solicitation stated explicitly that "[s]ubmission of cost or pricing date is not required . . ." AR 29.

In its "Acquisition Tradeoff Analysis," the Coast Guard noted the $113,896.00 price difference[13] between the offers of CommSol and CRI. AR 428. It also noted, however, that CRI had recently completed "Drydocking and Repairs" to the USCGC Drummond, "which contained many of the same work items that are included in the instant procurement." *Id*. In contrast, the work that CommSol had performed on the Boutwell and the Midgett was for "oil flush of the main reduction gear & lines" and "hot flush of the main engine and coolers," respectively. AR 305. The Boutwell contract was the largest of these two contracts, in the amount of $115,612.31. *Id*. The Coast Guard's own "Government Estimate of the total proposed price for the Staten Island work was $532,905.00, more than four times the amount of CommSol's contract on the Boutwell, whereas the three past contracts that CRI submitted as references were valued at $526,516.20, $551,937.53, and $792,804.50, respectively. AR 411-420. In light of these facts, the Coast Guard's analysis observed that

> It is apparent when comparing the actual level of work performed on similar drydock and repair contracts with the work to be performed on the instant procurement that Centrifugal Rebabbiting, Inc clearly has performed on more complex contracts that are consistent with the scope and value of the work to be performed on the USCG STATEN ISLAND. The references provided by Commissioning Solutions Global, LLC consisted of work that was not nearly as complex or similar to both the scope and value of the work on the instant procurement.

*Id*.

The Coast Guard then opined that "the higher past performance rating and experience displayed by Centrifugal Rebabbitting, Inc. in their performance of ship repair on USCG cutters is worth the additional monetary expenditure over the lower priced company due to the reasons stated above." *Id*. The "rub" of course, to Plaintiff, is that the Coast Guard also credited CRI with a "higher past performance rating" whereas CommSol was given a neutral rating based on the inability of the Coast Guard to obtain CommSol's Boutwell and Midgett performance ratings from other Coast Guard personnel or from its own records.

---

[12] Plaintiff's brief in reply to the Government's "Motion to Dismiss, and in the Alternative, Cross-Motion for Judgment upon the Administrative Record and Response to the Plaintiff's Motion for Judgment on the Administrative Record" was almost verbatim merely a reiteration of its initial "Motion for Judgment on the Administrative Record."

[13] This price difference is based on "Total Evaluated Price," which included the Coast Guard's estimate of "Foreseeable Costs." AR 428.

Although it is perplexing why the Coast Guard could not have obtained CommSol's past performance ratings, CommSol's reference to the violation of "procedures mandated by law regarding document retention" is made without citation to any authority, whether regulatory or statutory. Pl.'s Mot. 9. Furthermore, it is certainly an exaggeration for Plaintiff to complain of the Coast Guard's "failure to exert a minimum of effort to locate the USCG's own file." *Id*. The Coast Guard made numerous attempts to contact Ms. Rivera-Chase regarding CommSol's past work on the Boutwell and Mr. Gilbert regarding its past work on the Midgett contract. AR 402-06, 408-09, 425 (Staten Island); 1020, 1023, 1041, 1059-60 (Sapelo); 1855 (Patoka); 2413-16, 2475 (Knight (Island). Defendant makes an additional point that CommSol's work on the Midgett was completed more than three years prior to each of the solicitations in question, contrary to the requirement in the solicitation that the jobs submitted as references must have been performed within a three-year time period.

The court finds no violation of regulation or procedure in the Coast Guard's decision-making process, nor, especially given the "triple-whammy" of deference in a best-value procurement based on an assessment of past performance, does it find that the Coast Guard's award of the Staten Island contract to CRI was arbitrary or capricious. Its best value decision was adequately documented and evinces "rational reasoning and consideration of relevant factors" and must therefore be sustained. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).

B. The Patoka

Plaintiff's complaint regarding the Patoka solicitation is a mirror of its complaint regarding the Sapelo and Staten Island solicitations. Plaintiff argues that the "Neutral" rating it received for past performance in consideration of those contracts "would taint all subsequent CommSol proposals." Pl.'s Mot. 9. It avers that it "presented the lowest quotation[]" for the Patoka job, but that it was prejudiced by its "tainted past performance rating." *Id.* at 10.

CommSol, however, did *not* present the lowest bid, either with or without calculating the additional cost for transporting the Patoka to the various offerors' commercial shipyards. AR 1856. The lowest offer, once "foreseeable cost factors" were calculated, was in fact made by the eventual contract award winner, Wepfer Marine. CommSol's was the third lowest bid among the five bidders after such adjustment.

In addition, the Coast Guard noted that the contracts submitted by Wepfer as its past performance references were for jobs priced at $1,008,354 and $354,370, indicating experience on projects more significant in scope than CommSol's past work on the Boutwell and the Midgett. AR 1855. In its "Best Value Analysis," the Coast Guard concluded that Wepfer, having also been assigned a past performance rating of "Excellent+," "represents the overall best value to the Government" compared to a third bidder with the highest past performance rating, but which also had the highest price. AR 1856. The Coast Guard added as part of its

justification that Wepfer had "recently completed a similar scope of work to the Coast Guard's approval." *Id*.

The court finds that the Coast Guard's references to the dollar value of Wepfer's past contracts and its observation that Wepfer's most recent work was similar in scope to that required under the Patoka solicitation evince a rational analysis and sufficient consideration of the relevant factors. The Coast Guard sufficiently documented a reasonable explanation for its contract award.

Accordingly, again especially in view of the deference owed to the agency in this type of procurement, the court sees no basis for finding that the Coast Guard's decision-making process was arbitrary or capricious or in violation of regulation or procedure.

IV. Conclusion

Defendant's motion to dismiss is GRANTED with respect to the Sapelo and Knight Island solicitations. Defendant's motion for judgment on the administrative record is GRANTED with respect to the Staten Island and Patoka contracts. Plaintiff's motion for judgment on the administrative record is DENIED.

The Clerk of Court is hereby directed to enter judgment for Defendant.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge